**PEABODY HOLDING COMPANY, LLC; Black Beauty Coal Company, LLC, Plaintiffs–Appellants,**

v.

**UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION, Defendant–Appellee.**

No. 10–2134.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 27, 2011.

Decided: Jan. 11, 2012.

**ARGUED:** John R. Woodrum, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Washington, D.C., for Appellants. Deborah Stern, United Mine Workers of America, Triangle, Virginia, for Appellee. **ON BRIEF:** John R. Mooney, Mooney, Green, Saindon, Murphy & Welch, P.C., Washington, D.C., for Appellee.

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge DIAZ wrote the opinion, in which Judge NIEMEYER and Judge WYNN joined.

## OPINION

DIAZ, Circuit Judge:

Appellee United Mine Workers of America, International Union ("Union") entered into a limited job-preference agreement with Peabody Coal Company ("Peabody Coal"). The agreement, which included an arbitration clause, also bound Peabody Coal's parent company and the parent company's subsidiaries. Positing that the parent company—Peabody Holding Company, LLC ("Peabody Holding")—and a subsidiary—Black Beauty Coal Company

("Black Beauty")—had shirked their obligations under the agreement, the Union submitted a grievance to the arbitrator. The arbitrator found that the matter was arbitrable but deferred a ruling on the merits.

Peabody Holding and Black Beauty ("Appellants") responded to the arbitrator's ruling by seeking a declaratory judgment in federal court that the dispute is not arbitrable. The Union filed a counterclaim, requesting a declaratory judgment that Appellants must proceed before the arbitrator. The district court entered judgment in favor of the Union. It first ruled that the arbitrator properly determined the arbitrability of the dispute. In the alternative, the court concluded that the dispute was arbitrable, even if the arbitrator lacked authority to decide the arbitrability question. Appellants timely noted an appeal.

We affirm the judgment of the district court. As an initial matter, we find that the court, not the arbitrator, must decide whether the dispute is arbitrable. The parties' agreement lacks the requisite "clear and unmistakable" language evincing an intent to arbitrate arbitrability. Exercising our independent judgment on the arbitrability question, we conclude that Appellants have not rebutted the ordinary presumption in favor of arbitrability. Accordingly, the parties must proceed to arbitration.

I.

A.

From time to time, the Union negotiates a labor agreement with the Bituminous Coal Operators' Association, Inc. ("BCOA"). The BCOA is a bargaining group comprising a number of employers, each of whom is bound by the resulting agreements. Employers subject to these agreements are known as "signatory" companies.

In 1993, the Union sought to extend certain obligations to nonsignatory companies that were either parent companies of a signatory company or subsidiaries of such a parent company. Acceding to at least some of the Union's demands, signatory companies agreed to bind their nonsignatory parent companies and nonsignatory subsidiaries of those parent companies to a set of job-preference terms.

Peabody Coal, as a signatory company, executed a contract with the Union in 1993 that memorialized the job-preference agreement. The agreement was renewed in 1998, 2002, and 2007. The 2007 Memorandum of Understanding Regarding Job Opportunities ("Jobs Agreement") forms the basis of this action. The Jobs Agreement bound, among others, Peabody Coal; Peabody Holding, the parent company of Peabody Coal; and Black Beauty, a subsidiary of Peabody Holding.

The Jobs Agreement aims to "provide job opportunities for work of a classified nature to certain laid-off and active miners." J.A. 76. Specifically, it mandates that the nonsignatory companies offer a fixed percentage of jobs to miners who are either currently working for Peabody Coal or were laid off by Peabody Coal. The Jobs Agreement applies only to "existing, new, or newly acquired nonsignatory bituminous coal mining operations of the nonsignatory Companies," and it "does not constitute a covenant running with the land and does not apply to the sale of nonsignatory coal lands, coal reserves or coal operations (either asset sales or stock sales) of the non-signatory Companies." *Id.* 78. Moreover, nothing in the Jobs Agreement "encumber[s] or limit[s] in any way the rights of the nonsignatory Companies to sell, exchange, release, or otherwise simi-

larly convey ... any of their nonsignatory coal lands, coal reserves or coal operations to third parties." *Id.* The contract lists 11:59 p.m. on December 31, 2011 as the agreement's time of termination.

The Jobs Agreement contains an arbitration clause, which extends dispute-resolution authority to a Jobs Monitor:

> In order to effectuate the implementation of these job opportunity provisions, the [Union] and the non-signatory Companies subject to this [Jobs Agreement] agree that the impartial Jobs Monitor ... shall serve as the monitor under this [Jobs Agreement]. The monitor shall review the job selections pursuant to these provisions and investigate any alleged violations herein. The monitor shall have the authority to request such information which may be reasonably necessary in order to secure compliance with the job selection provisions. The parties have the obligation to comply with such requests.

*Id.* 79.

"Any dispute alleging a breach of this [Jobs Agreement]," if not resolved by the parties, may be submitted to the Jobs Monitor for resolution. *Id.* The Jobs Monitor's resulting decisions are "final and binding on all parties." *Id.* But the Jobs Agreement forbids the Jobs Monitor to "alter, amend, modify, add to or subtract from, or change in any way the provisions" of the contract. *Id.* The Jobs Agreement further prohibits non-signatory companies, the Union, and miners from using "any existing or future contractual grievance procedure ... to resolve any dispute that may arise concerning the interpretation or application" of the contract. *Id.*

### B.

In a November 20, 2008 letter to Peabody Holding, the Union stated its expectation that Peabody Holding and its non-signatory subsidiaries would continue to comply with the Jobs Agreement. The Union highlighted its concern with Black Beauty's mining operations in Lynnville, Indiana and the company's apparent unwillingness to extend job preferences in accordance with the Jobs Agreement.

Peabody Holding responded in a December 8 letter. It stated its belief that neither it nor any of its subsidiaries was bound by the Jobs Agreement any longer. Previously, on October 31, 2007, Peabody Energy Corporation ("Peabody Energy"), the owner of Peabody Holding and Black Beauty, divested itself of Peabody Coal, transferring the company to Patriot Coal Corporation ("Patriot"). Because Peabody Coal—the only signatory company once having a corporate relationship with Peabody Holding and Black Beauty—no longer shared any ties with Appellants, Peabody Holding contended that its obligations under the Jobs Agreement had been terminated. "An obligation to secure job opportunities for [Union] members under the [Jobs Agreement]," wrote Peabody Holding, "does not survive conveyance of the [Union]-represented subsidiary to a third party such as [Patriot]." J.A. 97. According to Peabody Holding, then, its responsibilities under the Jobs Agreement had extinguished on October 31, 2007, well before the Union had raised its current complaint.

Disputing Peabody Holding's assertions that it was no longer bound by the Jobs Agreement, the Union submitted its grievance to the Jobs Monitor. Both the Union and Peabody Holding provided the Jobs Monitor with materials supporting their respective arguments, though Peabody Holding maintained that it did not "accept or acquiesce to consideration by the Job [sic] Monitor of claims asserted under the

[Jobs Agreement], as that instrument no longer applies" to the company, *id.* 121.

The Jobs Monitor concluded that he, as the arbitrator, must decide the arbitrability of the dispute under the Jobs Agreement. He ultimately decided that the dispute was arbitrable but deferred a final resolution on the merits until further argument could take place.

Appellants responded to the Jobs Monitor's decision by filing a declaratory action in the district court. They sought an order vacating the Jobs Monitor's decision, declaring that the Union's claim is not arbitrable, and declaring that they have no obligation to provide hiring preferences. The thrust of Appellants' argument was that the divestiture of Peabody Coal left them without a corporate relationship with any signatory company, thereby extinguishing their obligations under the Jobs Agreement. The Union, for its part, filed a counterclaim. It sought an order declaring that the Jobs Monitor's decision is enforceable and directing Appellants to comply with the decision and proceed to a hearing on the merits before the Jobs Monitor.

After the parties filed competing motions for summary judgment, the district court entered judgment in favor of the Union. It first concluded that the Jobs Monitor, not the court, must decide whether this dispute is arbitrable. Construing the Supreme Court's recent decision in *Rent–A–Center, West, Inc. v. Jackson,* ––– U.S. ––––, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010), the court held that the arbitrator decides arbitrability where, as here, the defendant challenges the enforceability of the agreement as a whole.

In the alternative, the court held that the dispute was arbitrable. Even if the court, not the arbitrator, must resolve the arbitrability question, the district court still found that the Union prevailed. The

court emphasized the purportedly broad language of the arbitration clause and noted that Appellants' arguments impermissibly implicated the merits question at the arbitrability stage.

This appeal followed.

## II.

Arbitrability disputes often necessitate a two-step inquiry. *E.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). First, we determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if we conclude that the court is the proper forum in which to adjudicate arbitrability, we then decide *whether* the dispute is, in fact, arbitrable. We review de novo the district court's ruling as to both prongs. *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.,* 984 F.2d 113, 117 (4th Cir.1993).

For the following reasons, we hold that the court must determine the arbitrability of this dispute and that this dispute is arbitrable.

## III.

We first determine who decides the arbitrability issue. Appellants contend that nothing in the Jobs Agreement rebuts the heavy presumption that contracting parties intend that the court evaluate arbitrability. The Union counters that the arbitration clause in the Jobs Agreement is sufficiently broad to demonstrate that the parties intended for the Jobs Monitor to decide arbitrability. We agree with Appellants. The Jobs Agreement wholly lacks language "clearly and unmistakably" providing that the Jobs Monitor must decide the arbitrability question. The Union is thus unable to demonstrate that the parties agreed to arbitrate arbitrability.

As in any garden-variety contractual claim, the intent of the contracting parties guides our analysis. *Carson v. Giant Food, Inc.*, 175 F.3d 325, 328–29 (4th Cir.1999). Although we have adopted a " 'general policy-based, federal presumption in favor of arbitration,' " that presumption is not applied " 'to resolve questions of the arbitrability of arbitrability issues themselves.' " *Id.* at 329 (quoting *Va. Carolina Tools*, 984 F.2d at 117). Indeed, "the question of arbitrability ... is undeniably an issue for judicial determination." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Parties, to be sure, can agree to arbitrate arbitrability, but such agreement "must ... 'clearly and unmistakably' provide that the arbitrator shall determine what disputes the parties agreed to arbitrate." *Carson*, 175 F.3d at 329 (quoting *AT & T*, 475 U.S. at 649, 106 S.Ct. 1415).[1]

The "clear and unmistakable" standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice. *See id.* ("The 'clear and unmistakable' test set forth by the Supreme Court requires more than simply saying that the arbitrator determines the meaning of any disputed contractual terms."). We have therefore found that an arbitration clause "committ[ing] all interpretive disputes 'relating to' or 'arising out of' the agreement" does not satisfy the "clear and unmistakable" test. *Id.* at 330; *see also E.I. DuPont de Nemours & Co. v. Martinsville Nylon*

*Emps.' Council Corp.*, 78 F.3d 578 (4th Cir.1996) (unpublished) (holding "clear and unmistakable" test not met where contract provided for arbitration of "[a]ny question as to the interpretation of this Agreement or as to any alleged violation of any provision of this Agreement"). "Those who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect." *Carson*, 175 F.3d at 330–31.

Contrary to the assertions of the Union and reasoning of the district court, the Supreme Court's decision in *Rent–A–Center* did not signal retrenchment from the "clear and unmistakable" doctrine. Quite the opposite, the Court reaffirmed the continuing vitality of the demanding test. *See* 130 S.Ct. at 2778 n. 1. The Court acknowledged matter-of-factly that, to submit the arbitrability determination to an arbitrator, a court must find clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *Id.* It further clarified that the "clear and unmistakable" test applies only "to the parties' *manifestation of intent*, not the agreement's *validity*." *Id.* Thus the Court rejected the plaintiff's argument that, to submit the merits question to the arbitrator, a court need find a "clear and unmistakable" absence of unconscionability. *Id.*

Applying these principles to the Jobs Agreement, we find that the terms of the contract fail to satisfy the "clear and un-

---

1. The Union contends that we should not rely on *Carson* here, because *Carson* is a narrow decision "provid[ing] the analytical construct for disputes over the intersection of a collective bargaining agreement's arbitration provision and an employee's right to independently litigate statutory employment-related claims." Appellee's Br. 24. The Union points to nothing in our precedent or Supreme Court case law that cabins *Carson*'s analysis on those grounds. Nor could it. *See, e.g., Granite Rock Co. v. Int'l Bhd. of Teamsters*, —— U.S. ——, 130 S.Ct. 2847, 2857 n. 5, 177 L.Ed.2d 567 (2010) (confirming propriety of applying "clear and unmistakable" requirement to dispute *not involving* employee's statutory employment claim).

mistakable" test. Therefore, the court, not the Jobs Monitor, must determine the arbitrability of the parties' dispute. The Jobs Agreement provides for arbitration of "[a]ny dispute alleging a breach of this [Jobs Agreement]." J.A. 79. The parties' arbitration clause is thus more narrow than those found insufficient to commit the arbitrability question to the arbitrator in *Carson*, 175 F.3d at 328 ("[A]ny grievance or dispute ... regarding the terms of this Agreement"), and *DuPont*, 78 F.3d at 578 ("Any question as to the interpretation of this Agreement or as to any alleged violation of any provision of this Agreement"). In short, nothing in the Jobs Agreement even approaches the model language that we suggested parties use to evince a clear intent to arbitrate arbitrability, *see Carson*, 175 F.3d at 330–31. Given the exacting test that parties must meet to overcome the presumption that they intended that a court decide arbitrability, *AT & T*, 475 U.S. at 649, 106 S.Ct. 1415, we readily conclude that the Jobs Agreement fails to satisfy this standard. Accordingly, we must proceed to decide whether this dispute is arbitrable.[2]

## IV.

■ Finding that the parties have committed to the court the authority to determine whether this dispute is arbitrable, we turn to that inquiry. Appellants contend that a court must resolve the threshold inquiry of whether the severance of their relationship with Peabody Coal, the lone signatory company once in their corporate structure, extinguishes their obligations under the Jobs Agreement. According to Appellants, they cannot be forced to arbitrate a dispute that calls into question the enduring validity of the very contract that the Union points to as the font of Appellants' duty to arbitrate.

We disagree. Federal courts have developed a robust presumption in favor of arbitrability, one that Appellants are unable to rebut. We have further cautioned that we must not delve into the merits while conducting the arbitrability analysis, and a party may not cloak substantive contentions in jurisdictional garb to evade its obligations under an arbitration clause. Accordingly, we hold that the Union and Appellants must proceed to arbitration to resolve this dispute.

### A.

■ The twin pillars of consent and intent are the touchstones of arbitrability analysis. " 'Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' ... [T]he determination of what disputes are arbitrable is focused on the intent of the parties." *Carson*, 175 F.3d at 328–29 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). We have insisted that, in general, "the parties—not the courts—control which disputes will be arbitrated." *Id.* at 329.

---

**2.** In an effort to resist this conclusion, the Union cites *Bhd. of Teamsters Local # 70 v. Interstate Distrib. Co.*, 832 F.2d 507 (9th Cir. 1987). Reliance on this case is misplaced, for at least two reasons. First, we have never endorsed the holding in *Interstate*, which is an outlier decision, instead remaining steadfast in our adherence to a strict interpretation of the Supreme Court's "clear and unmistakable" test. Second, unlike the Jobs Agreement, the arbitration clause in *Interstate* was "even broader than the ordinary 'broad arbitration clause,' " *id.* at 510 n. 2. The Ninth Circuit later relied on the uniqueness of the arbitration clause to cabin *Interstate* as controlling only cases with similarly broad arbitration clauses. *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distrib., Teamsters Local 63*, 849 F.2d 1236, 1239 (9th Cir.1998).

■ Our analysis in this context follows a markedly different course from determining who decides arbitrability. Federal law reverses the presumption when deciding whether a dispute is arbitrable, adjudging a dispute arbitrable unless the parties have clearly indicated otherwise. *First Options*, 514 U.S. at 944–45, 115 S.Ct. 1920. When interpreting a contract containing an arbitration clause, "there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347). "'Doubts should be resolved in favor of coverage.'" *Id.* (quoting *Warrior & Gulf*, 363 U.S. at 583, 80 S.Ct. 1347).

■ Sound analytical and policy reasons justify this judicial embrace of arbitration. A presumption in favor of arbitrability generally vindicates the intent of the contracting parties. The question of whether a particular dispute is arbitrable "arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration." *First Options*, 514 U.S. at 945, 115 S.Ct. 1920. Because the parties negotiate with a backdrop of "the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter." *Id.* (citation omitted). Presuming that parties intended to arbitrate a given dispute similarly comports with the judiciary's policy favoring enforcement of arbitration agreements to promote "efficient and speedy dispute resolution," *Dean Witter Reynolds, Inc. v.*

*Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

■ When evaluating arbitrability, we must not accept a party's invitations to critically appraise the merits of the underlying dispute. Nor may we sanction obfuscation designed to shepherd an otherwise-arbitrable grievance into court. As the Supreme Court has declared, courts at the arbitrability stage "'have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.'" *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)); *see also United Steel Workers Int'l Union v. Continental Tire N.A., Inc.*, 568 F.3d 158, 165 (4th Cir.2009) (refusing to consider party's argument because it would "draw[ ] [the court] too far into the arbitrator's role of deciding the merits of the claim"). Cognizant that parties are able to craft cleverly phrased arguments in an attempt to secure a judicial forum to hear an underlying claim, "we are . . . obliged not to permit a party to wiggle out of an obligation to which it has agreed." *United Steel*, 568 F.3d at 166; *see also Unite Here Local 217 v. Sage Hospitality Res.*, 642 F.3d 255, 260–62 (1st Cir.2011) (rejecting party's argument that a court must resolve all questions of contract duration before submitting a dispute to arbitration).

■ To be sure, courts will not blindly apply the presumption in favor of arbitrability, overlooking crucial nuances of the dispute before them. We must carefully consider any claims that the agreement— including its arbitration clause—was not executed properly. *Granite Rock*, 130 S.Ct. at 2855–59. Indeed, "where the dispute at issue concerns contract formation,

the dispute is generally for courts to decide." *Id.* at 2855–56. Thus where a contract commits to arbitration those matters "arising under" the agreement, we may not submit questions of contract formation to the arbitrator, as those questions cannot "arise under" an agreement that was never validly formed. *Id.* at 2860–61. The Court in *Granite Rock* focused its discussion on rejecting a party's argument that precedent "require[s] arbitration of certain disputes . . . based on policy grounds even where evidence of the parties' agreement to arbitrate the dispute in question is lacking." *Id.* at 2858; *see also Cent. W. Va. Energy, Inc. v. Bayer Crop-science LP,* 645 F.3d 267, 277 n. 11 (4th Cir.2011) (limiting import of *Granite Rock* to disputes revolving around contract formation).

▆▆▆▆ We have similarly held that, in a narrow class of cases, courts—not arbitrators—must decide questions of contract duration. *Va. Carolina Tools,* 984 F.2d at 115–118. In *Virginia Carolina Tools,* we confronted a dispute involving an option agreement containing an arbitration clause covering "any dispute aris[ing] between the parties." *Id.* at 115. The parties agreed that the option provision as written had expired before the claim at issue arose, but they disagreed as to whether subsequent oral discussions constituted a new option agreement. *Id.* In that case, we thought "it proper to accord [the presumption in favor of arbitrability] less force in respect of contract duration issues than is appropriate in respect of disputes arising under a contract whose own continuation is unchallenged." *Id.* at 118. A critical element of the dispute convinced us that the matter was not arbitrable. The contract included an express termination-date provision, which the parties agreed extinguished the obligations under the contract—at least as written. *Id.* As a result

of the clear durational limitation enshrined in the contract, we concluded that there was "no incipient issue of contract duration in the parties' memorialized agreement, hence no built-in likelihood of dispute over its duration." *Id.*

### B.

With the foregoing principles in tow, we conclude that the Jobs Agreement is, at the very least, ambiguous as to whether this dispute is arbitrable. We accordingly apply the presumption in favor of arbitrability. Finding that Appellants have not rebutted the presumption, we hold that the parties must proceed before the Jobs Monitor.

We begin by looking to the text of the Jobs Agreement. The Jobs Agreement provides that the parties must submit to the Jobs Monitor "[a]ny dispute alleging a breach of this [Jobs Agreement]." J.A. 79. Appellants try to cast the arbitration clause as constraining the Jobs Monitor to a bean-counting function, authorized only to crunch numbers and adjudicate highly technical grievances implicating the mechanics of the job-preference provisions. Both the language of the Jobs Agreement and common sense belie Appellants' contention. Authority to resolve disputes alleging a breach of the Jobs Agreement necessarily confers on the Jobs Monitor power to perform concomitant functions—for instance, the Jobs Monitor must be able to interpret the Jobs Agreement to determine whether a breach has occurred, and he must be given latitude to craft an appropriate remedy in the event of a breach. Although the Jobs Agreement is certainly more narrow on its face than a standard broad arbitration clause—one that commits to arbitration any dispute "arising under" an agreement—it does provide the Jobs Monitor with significant

authority to enforce and interpret the contract.

Recognizing that the Jobs Monitor's powers under the Jobs Agreement are not insubstantial, we find that Appellants' durational argument is encompassed within the arbitration clause. We first note that we will apply in full the presumption in favor of arbitrability, as this case is distinguishable from *Virginia Carolina Tools*. Our decision to "accord ... less force" to the presumption in *Virginia Carolina Tools* was grounded in the agreement's express termination-date provision, the presence of which foreclosed any "incipient issue of contract duration in the parties' memorialized agreement." 984 F.2d at 118. Here, in contrast, Appellants' durational argument does not focus on an express termination-date provision. Indeed, the Jobs Agreement's only such provision calls for the extinguishment of all obligations on December 31, 2011.

Appellants instead interpret other language in the Jobs Agreement as compelling termination of the contract when companies sever all ties with a signatory company, a position strenuously objected to by the Union. Specifically, Appellants focus their durational argument on Paragraph 9 of the contract, which provides that the Jobs Agreement "does not constitute a covenant running with the land and does not apply to the sale of nonsignatory coal lands, coal reserves or coal operations (either asset sales or stock sales) of the nonsignatory Companies." J.A. 78. Paragraph 9 is far from an express termination-date provision, and it is not clear from the text what role—if any—its terms play in this dispute. Whereas in some instances we can neatly apply an express termination-date provision and conclude that the parties did not foresee arbitration of durational questions, resolution of the parties' durational dispute in this case is more akin to an intricate interpretational question presumed to have been committed to the arbitrator. Thus we can confidently say that, when the parties included the language invoked by Appellants, they realized that it may implicate an "incipient issue of contract duration," one that involves a "built-in likelihood of dispute over [the Jobs Agreement's] duration," *Va. Carolina Tools*, 984 F.2d at 118. This dispute therefore lacks the factors critical to our decision not to squarely apply the presumption in favor of arbitrability in *Virginia Carolina Tools*.

Because the parties agree that the Jobs Agreement was valid when executed, this case is moreover not governed by the limiting language found in *Granite Rock. See* 130 S.Ct. at 2855–56; *Cent. W. Va. Energy*, 645 F.3d at 277 n. 11. We must thus find this dispute arbitrable " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' " *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347).

As outlined above, the Jobs Agreement necessarily gives the Jobs Monitor the authority to interpret contractual language and analyze defenses raised by a party charged with breaching the agreement. And indeed, Appellants do not contest that the Jobs Monitor may permissibly interpret the contract when determining whether a party has breached the Jobs Agreement. Instead, they posit that whenever the party alleged to have breached the contract raises a durational argument, the Jobs Monitor's authority ceases and the case must be brought before a court.

We are not persuaded by Appellants' rigid formulation. A dispute over the meaning of durational language is "a classic issue of contract construction." *Unite Here*, 642 F.3d at 262. The Jobs Agree-

ment gives the Jobs Monitor authority to construe the contract insofar as such interpretation is necessary to determine whether a party has breached it. Here, the Union charged that Appellants had violated the Jobs Agreement by refusing to offer requisite job preferences at a particular mining site. Appellants responded by arguing that they had not breached the Jobs Agreement, because they were no longer bound by the contract. To determine whether Appellants have breached the contract, then, the Jobs Monitor must decide the threshold durational issue. The Union presents, at the very least, a defensible argument that resolution of this issue is subsumed under the Jobs Agreement's delegation to the Jobs Monitor of authority to resolve "[a]ny dispute alleging a breach of this [Jobs Agreement]." J.A. 79. We therefore cannot say " 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' " *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347). This is all that precedent requires to compel arbitration.

Our decision to apply the presumption in this case and find the dispute arbitrable vindicates the policies underpinning the judiciary's endorsement of arbitration as an effective mechanism for resolving grievances. Indeed, accepting Appellants' argument—that every durational dispute raised pursuant to an arbitration clause that is not unusually broad must be adjudicated by a court—risks frustrating our goal of promoting "efficient and speedy dispute resolution," *Dean Witter*, 470 U.S. at 221, 105 S.Ct. 1238. We must eschew a regime in which a party "wiggle[s] out of an obligation to which it has agreed," *United Steel*, 568 F.3d at 166, merely by raising a particular defense, no matter how fanciful. In this case, as in many others, faithful application of the presumption in favor of arbitrability furthers important policy interests and guards against potential abuses of the duty to arbitrate.

## V.

Finding that the court—not the Jobs Monitor—must decide arbitrability, we conclude that Appellants have not rebutted the ordinary presumption in favor of arbitrability. Accordingly, we affirm the judgment of the district court.

*AFFIRMED.*