729 S.E.2d 808

**STATE of West Virginia, ex rel. JOHNSON CONTROLS, INC., York International Corporation, and Morgan Keller, Inc., Petitioners**

**v.**

**The Honorable Susan B. TUCKER, Judge of the Circuit Court of Monongalia County, and Glenmark Holding, LLC, Respondents.**

No. 11–1515.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 8, 2012.

Decided June 13, 2012.

Thomas A. Heywood, Esq., Charles M. Love, III, Esq., Bowles Rice McDavid Graff & Love, Charleston, West VA, Charles C. Wise, III, Esq., Bowles Rice McDavid Graff & Love, Morgantown, West VA, Attorneys for York International and Johnson Controls, Inc.

Denise D. Pentino, Esq., Jacob A. Manning, Esq., Dinsmore & Shohl, LLP, Wheeling, West VA, Attorneys for Morgan Keller, Inc.

William E. Galeota, Esq., Rodney L. Bean, Esq., Brian D. Gallagher, Esq., Chelsea V. Brown, Esq., Steptoe & Johnson PLLC, Morgantown, WV, Attorneys for Glenmark Holding, LLC.

KETCHUM, Chief Justice:

In this construction lawsuit we are asked to examine a circuit court order refusing to compel a plaintiff corporation to arbitrate its claims against three defendant corporations. The circuit court entered two orders in which it found that the arbitration clauses in the

defendants' contracts with the plaintiff were unconscionable. Further, the circuit court found that it would be inequitable to fracture the plaintiff's lawsuit into multiple "piecemeal" arbitrations and lawsuits against the defendants.

The defendants have petitioned this Court for a writ of prohibition to halt enforcement of the circuit court's orders, and to compel the plaintiff to arbitrate its claims. After consideration of the record, and the briefs and the arguments of the parties, we grant the requested writ of prohibition as moulded.

## I. *Facts and Procedural Background*

Respondent (and plaintiff below) Glenmark Holding, LLC ("Glenmark"), owns an office building in Morgantown, West Virginia, called the "Suncrest Executive Office Plaza" or "United Center." Glenmark alleges that it took delivery of the newly constructed building in August 2004 and immediately began experiencing serious problems with the heating, ventilation and air-conditioning ("HVAC") system.

On June 13, 2011, Glenmark brought a lawsuit claiming that the HVAC system had been improperly designed, that it had been improperly constructed, that the HVAC equipment used in the system was defectively designed or manufactured, or that the system had been improperly maintained. Glenmark named seven defendants, including the general contractor that oversaw construction of the building (petitioner Morgan Keller, Inc.), and the two companies that manufactured and later maintained the HVAC equipment (petitioner York International Corporation and its parent corporation, petitioner Johnson Controls, Inc., hereafter called the "York petitioners").[1] The seven defendants filed cross-claims against one another. The three petitioners—Morgan Keller and the two York petitioners—now assert, separate from the other four defendants, that Glenmark is contractually bound to arbitrate its claims.

On August 8, 2011, petitioner Morgan Keller, Inc., filed a motion to compel Glenmark to arbitrate its claims against Morgan Keller. Morgan Keller asserted that the duty to arbitrate arose from a contract Morgan Keller signed with Glenmark on August 1, 2003, to construct the office building. The contract was on a form drafted by the American Institute of Architects and was titled "AIA Document A101–1997, Standard Form of Agreement Between Owner and Contractor." The contract incorporates by reference the "General Conditions of the Contract for Construction," also known as "AIA Document A201–1997." Document A201–1997 contains an express arbitration clause which states, "Any Claim arising out of or related to the Contract . . . shall . . . be subject to arbitration." [2]

Likewise, the two York petitioners filed a separate motion to compel Glenmark to separately arbitrate all of its claims against the York petitioners. The York petitioners manufactured some of the HVAC equipment that was in Glenmark's office building; among various theories in its complaint, Glenmark now asserts that the equipment was "defective, ineffective, inefficient, and not suitable for use on that building[.]" However, after construction of the building was completed, in December 2004, Glenmark entered into a "Preventative Maintenance Agreement" with the York petitioners for periodic inspections of and routine maintenance on the HVAC system. The maintenance agreement has an arbitration clause that states, in part:

> All claims, disputes and controversies arising out of or relating to this contract, or the breach thereof, shall, in lieu of court action, be submitted to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association[.]

Glenmark asserts that the York petitioners breached the maintenance agreement and carelessly failed to keep the HVAC equipment in working order.

---

**1.** The remaining four defendants are KA, Inc., the architectural firm that designed the building and oversaw its construction; Thorson Baker & Associates, Inc.; Comefri U.S.A., Inc.; and City Plumbing and Heating.

**2.** AIA Document A201–1997, "General Conditions of the Contract for Construction," ¶ 4.6.1.

In response to the motions by Morgan Keller and the York petitioners, Glenmark asserted that the arbitration clauses were unconscionable and unenforceable, and asked the circuit court to deny the motions. Additionally, three defendants—who were not parties to any arbitration agreement and who had filed cross-claims against Morgan Keller and the York petitioners—filed briefs asserting that the motions should be denied so all of the claims and cross-claims of the parties could be litigated in one forum, in one proceeding.

The circuit court conducted a hearing on the petitioners' two motions on September 8, 2011. The circuit court acknowledged that arbitration is preferred over litigation because of its supposed "expeditious, economic resolution of issues." The circuit court noted, however, that by granting the petitioners' motions that the petitioners would expend additional, not fewer, resources responding to the parties' claims and cross-claims. Granting the motions would sever one individual lawsuit by Glenmark against seven defendants into at least three proceedings: (1) one lawsuit against six defendants, including the York petitioners for defective HVAC equipment; (2) one arbitration proceeding with Morgan Keller, for negligent general contracting services; and (3) one arbitration proceeding with the York petitioners over negligent maintenance of the HVAC equipment. Further, the petitioners and the other defendants (none of whom were parties to the arbitration agreements) would have to resolve their cross-claims in circuit court.[3]

In an order dated October 5, 2011, the circuit court denied the York petitioners' motion to compel arbitration. In an order dated October 19, 2011, the circuit court similarly denied petitioner Morgan Keller's motion. In both orders, the circuit court determined that compulsory arbitration would be insufficient and inequitable to resolve all of Glenmark's claims against the petitioners, and "would result in an unnecessarily delayed 'piecemeal' resolution of this conflict and the waste of judicial resources." Because of the claims and cross-claims of the parties, compelling arbitration "would permit neither the Plaintiff nor the Defendants to fully and effectively adjudicate their various claims and defenses." The circuit court went on to find that the arbitration clauses in both contracts were unconscionable and, therefore, unenforceable.

On November 3, 2011, petitioner Morgan Keller and the two York petitioners filed a petition for a writ of prohibition with this Court. The petitioners ask that we halt enforcement of the circuit court's orders, and that we halt all proceedings by Glenmark against the petitioners before the circuit court. As we discuss below, we grant the requested writ as moulded.

## II. *Standard of Review*

 A petition for a writ of prohibition is an appropriate method to obtain review by this Court of a circuit court's decision to deny or compel arbitration.[4] As it is an extraordinary remedy, "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." [5]

 In cases where the trial court is alleged to have exceeded their authority, we set forth the following standard of review:

> Now, that to me flies in the face of the stated policy behind arbitration and the reason why arbitration is looked upon favorably, and that is to avoid large costs of litigation.

**3.** As the circuit court stated to counsel for the two York petitioners:

> If I grant your motion for arbitration ... that means that you and Glenmark will participate in arbitration. As I see it there are 1, 2, 3, 4 other defendants.... A bunch whose claims need to be arbitrated to see what degree of culpability, if any, each of those defendants has with regard to the damages that Glenmark claims. If they are not participating in the arbitration, then those issues would still have to be litigated and they would be litigated here in circuit court ...

**4.** *See, State ex rel. Saylor v. Wilkes,* 216 W.Va. 766, 613 S.E.2d 914 (2005); *State ex rel. Dunlap v. Berger,* 211 W.Va. 549, 555, 567 S.E.2d 265, 271 (2002).

**5.** Syllabus Point 1, *Crawford v. Taylor,* 138 W.Va. 207, 75 S.E.2d 370 (1953).

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.[6]

### III. *Discussion*

### A. *Threshold Issues in a Motion to Compel Arbitration*

 The petitioners assert that the interpretation of the arbitration clauses is governed exclusively by the Federal Arbitration Act ("the FAA"). "Under the Federal Arbitration Act, 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable or unenforceable upon a ground that exists at law or in equity for the revocation of any contract."[7]

When a motion to compel arbitration is filed in a trial court, the FAA requires the following procedure:

When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement.[8]

The FAA permits the court to refuse enforcement of an arbitration agreement to the extent "such grounds ... exist at law or in equity for the revocation of any contract."[9] Nothing in the FAA "overrides normal rules of contract interpretation. Generally applicable contract defenses—such as laches, estoppel, waiver, fraud, duress, or unconscionability—may be applied to invalidate an arbitration agreement."[10] As in any garden-variety contractual claim, the intent of the contracting parties should guide the court's analysis.[11]

The petitioners assert that the FAA leaves no place for the exercise of discretion by a trial court. They assert that once the FAA is invoked, a trial court is required, as a matter of law and without question or delay, to compel a respondent to participate in arbitration. The petitioners state in their brief to this Court, "because the Federal Arbitration Act controls and because [Glenmark's] claims were subject to arbitration, the Circuit Court lacked subject matter jurisdiction to consider Glenmark's claims." We disagree.

 "The FAA has no talismanic effect; it does not elevate arbitration clauses to a level of importance above all other contract

---

**6.** Syllabus Point 4, *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996).

**7.** Syllabus Point 9, *Brown v. Genesis Healthcare Corp.,* 228 W.Va. 646, 724 S.E.2d 250 (2011) ("*Brown I* ").

**8.** Syllabus Point 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman,* 225 W.Va. 250, 692 S.E.2d 293 (2010).

**9.** 9 U.S.C. § 2.

**10.** Syllabus Point 9, *Brown I.*

**11.** *See Peabody Holding Co., LLC v. United Mine Workers of America, Intern. Union,* 665 F.3d 96, 102 (4th Cir.2012) ("As in any garden-variety contractual claim, the intent of the contracting parties guides our analysis.").

terms."[12] "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."[13] It is a "fundamental principle that arbitration is a matter of contract,"[14] and "[t]he FAA ... places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."[15] Put simply, the "purpose of Congress in [adopting the FAA in] 1925 was to make arbitration agreements as enforceable as other contracts, but not more so."[16] Therefore, even though the petitioners' arbitration clauses clearly arose out of a contract that evidences a transaction affecting interstate commerce, the circuit court was within its authority to consider Glenmark's claim that the arbitration clauses were unenforceable under generally applicable contract law defenses.

### B. The Doctrine of Unconscionability and Piecemeal Litigation

Respondent Glenmark argues that the circuit court correctly found that, under the common law of contracts, the arbitration clauses are unconscionable. In part, Glenmark contends that because the arbitration clauses will result in inefficient, inconsistent, and expensive "piecemeal" litigation, the clauses may be considered to be unconscionable. As we discuss below, we reject Glenmark's contention.

In *Brown v. Genesis Healthcare Corp.* ("*Brown I*"),[17] this Court assembled an extensive set of common law factors for courts to analyze in deciding whether a contract, or a particular term or clause within a contract, is unconscionable. We reaffirmed this unconscionability analysis in a rehearing of *Brown I*, an opinion which is referred to as *Brown II*.[18]

■■■■ "The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case."[19]

■■■■ Undertaking "[a]n analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole."[20] "A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.' "[21] "[T]he particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be

**12.** *Brown I*, 228 W.Va. at 671, 724 S.E.2d at 275.

**13.** *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)

**14.** *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. ——, ——, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010).

**15.** *Id.*, (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) and *Volt Information Sciences*, 489 U.S. at 478, 109 S.Ct. 1248).

**16.** *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

**17.** *Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 724 S.E.2d 250 (2011) ("*Brown I* "), vacated on other grounds by *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. ——, ——, 132 S.Ct. 1201, 1204, 182 L.Ed.2d 42 (2012).

**18.** See *Brown v. Genesis Healthcare Corp.*, 229 W.Va. 382, 729 S.E.2d 217 (2012) ("*Brown II* ").

**19.** Syllabus Point 12, *Brown I*. See also, Syllabus Point 2, *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 ("[P]rovisions of an agreement ... which, if applied strictly, are so one-sided as to lead to absurd results, will be declared unconscionable.").

**20.** Syllabus Point 3, *Troy Min. Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986).

**21.** Syllabus Point 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co. of West Virginia, Inc.*, 186 W.Va. 613, 413 S.E.2d 670 (1991).

unconscionable in some situations but not in others."[22]

■ "Under West Virginia law, we analyze unconscionability in terms of two component parts: procedural unconscionability and substantive unconscionability."[23] "A contract term is unenforceable if it is both procedurally and substantively unconscionable. However, both need not be present to the same degree. Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa."[24]

■ This Court set forth the following guidelines for determining procedural unconscionability in Syllabus Point 17 of *Brown I*:

Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.[25]

We are cognizant, however, that "[i]n most commercial transactions it may be assumed that there is some inequality of bargaining power, and this Court cannot undertake to write a special rule of such general application as to remove bargaining advantages or disadvantages in the commercial area, nor do we think it necessary that we undertake to do so."[26]

■ "Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns."[27]

■ We recognized in *Brown I* that "[n]o single, precise definition of substantive unconscionability can be articulated"[28] because "the factors to be considered vary with the content of the agreement at issue."[29] "Accordingly, courts should assess whether a contract provision is substantively unconscionable on a case-by-case basis."[30]

■ With these general guidelines in mind, we now turn to the circuit court's determination that the petitioners' arbitration clauses were inequitable, unconscionable and unenforceable because they would result in piecemeal litigation. It is axiomatic that an arbitration agreement is a contract usually between just two parties. However, lawsuits—particularly construction lawsuits—are often multi-party affairs. As one legal commentator perceived, enforcing an arbitration agreement between two parties of a multi-party lawsuit virtually guarantees an inefficient and inconsistent outcome:

---

22. Syllabus Point 2, *Orlando v. Finance One of West Virginia, Inc.*, 179 W.Va. 447, 369 S.E.2d 882 (1988).

23. *Brown I*, 228 W.Va. at 681, 724 S.E.2d at 285.

24. Syllabus Point 20, *Brown I*.

25. Syllabus Point 17, *Brown I*.

26. *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 474, 223 S.E.2d 433, 440 (1976).

27. Syllabus Point 19, *Brown I*.

28. *Brown I*, 228 W.Va. at 684, 724 S.E.2d at 288.

29. *Id.*, 228 W.Va. at 683, 724 S.E.2d at 287 (*quoting Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 69, 908 N.E.2d, 408, 414 (2009)).

30. *Id.*, 228 W.Va. at 684, 724 S.E.2d at 288.

Arbitration under the American Institute of Architects (AIA) A201 General Conditions and its other form contracts pits a two-party procedure against a multiple-party world. While the owner and general contractor must arbitrate under the AIA procedures, often the real culprits—the architect, subcontractors, engineers, or suppliers—need not participate and, equally important, the ultimate sources of payment, the surety or liability insurer, also are left out.

Arbitration should be quick, easy, and efficient. Instead, by sometimes omitting crucial parties, AIA arbitration may foster inefficiency and inconsistency. Although the legal system is better suited to handle multiparty disputes, the contractor and owner generally are committed to two-party arbitration under the AIA contract.

The AIA arbitration contract may exacerbate inherent complexities of construction litigation by insisting on two-party arbitration while other parties litigate their similar claims. As a result, the owner and prime contractor are at odds with each other at the inception of the dispute, when they should be working together to solve their problems. Ultimately, the result is that crucial parties need not arbitrate, and the parties must present the same evidence, the same witnesses, and the same arguments before two fact-finding tribunals, often with conflicting decisions and without res judicata as to many of the other crucial parties. This is a failure that neither the arbitration rules nor the laws of most states are prepared to solve.[31]

A treatise on construction arbitration agreements observed that neither the facts of the instant case, nor the legal quandaries presented by the parties' arguments, are that uncommon:

Construction disputes often involve more than two parties. A construction defect, for example, an inadequately operating air-conditioning system, could be the fault of the architect, the mechanical engineer, the general contractor, the mechanical subcontractor, the electrical subcontractor, or the manufacturer of the air-conditioning equipment.

When presented with situations where an entire controversy cannot be resolved by arbitration because not all the parties have agreed to arbitrate the dispute, courts seek to consolidate arbitration proceedings. Failing to consolidate proceedings, some courts order piecemeal resolution of the dispute, usually requiring arbitration first and litigation later. Other courts have applied a balancing test that sometimes results in nullification of the arbitration agreement.[32]

The circuit court recognized the legal quandary in both of its orders.[33] The circuit court determined that, were it to grant the petitioners' motions to compel arbitration, it would be shattering a unified lawsuit into numerous inefficient proceedings that are prone to reaching inconsistent results. As the circuit court said in one of its orders, "inequity would result from the application of the arbitration clause[s] to this dispute:"

31. Thomas E. McCurnin, "Two–Party Arbitrations in a Multiple–Party World," 26 Construction Lawyer 5 (Winter, 2006).

32. James Acret, *Construction Arbitration Handbook* § 5:1 (2nd Ed.2006).

33. The proper name for the legal quandary is the "intertwining doctrine."

Narrow arbitration provisions give rise to the prospect of determining disputes in more than one forum, because some disputes may fall within the narrow clause and others outside. This can create inefficiencies and, if the claims are sufficiently interrelated, can create a potential for inconsistent outcomes. The same undesirable results could occur in situa-

tions where broad arbitration clauses are used but the dispute involves numerous parties, some of which are obligated to arbitrate and others who are not. Prior to 1985, courts often addressed this situation by exercising what they believed was discretion in deciding that, in the event that arbitrable and non-arbitrable claims were sufficiently intertwined, arbitration would be denied in favor of resolving all the claims in one forum. The exercise of discretion in these circumstances was known as the "doctrine of intertwining." Philip L. Bruner, Patrick J. O'Connor, Jr., 6 *Bruner & O'Connor on Construction Law* § 20:58 (2002). As we discuss later, as a result of two decisions of the United States Supreme Court in 1983 and 1985, the intertwining doctrine has all but disappeared from arbitration jurisprudence.

Given that arbitration would be insufficient to resolve all of [Glenmark's] claims against all Defendants named in this action, and that the cross-claims filed by various Co–Defendants against [the petitioners] would survive, an important policy underlying arbitration—namely speedy resolution of the conflict and conservation of the parties' resources—is not applicable in these circumstances.... The Court finds persuasive [Glenmark's] argument that it must be allowed to present evidence of each Defendant's role in the specification, selection, installation and maintenance of the subject HVAC system, so that the degree of each Defendant's contributing culpability can be considered and allocated. As a result, the Court finds that compulsory arbitration would result in an unnecessarily delayed "piecemeal" resolution of this conflict and the waste of judicial resources.

We find that the circuit court's orders are eminently reasonable, logical and just. They are also, unfortunately, directly contrary to the United States Supreme Court's interpretations of the Federal Arbitration Act.

■■■ The Supreme Court has interpreted the FAA "to require that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation." [34] "A court may not issue a blanket refusal to compel arbitration merely on the grounds that some of the claims could be resolved by the court without arbitration." [35] As early as 1983, the Supreme Court concluded that the FAA "*requires* piecemeal resolution when necessary to give effect to an arbitration agreement. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of

other persons who are parties to the underlying dispute but not to the arbitration agreement." [36] In 1985, the Supreme Court emphasized that the FAA requires a court to enforce the bargain of the parties to arbitrate and "not substitute [its] own views of economy and efficiency" for those of Congress.[37] A court is therefore required to "compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." [38]

■■■ In accordance with the holdings of the Supreme Court, we hold that the FAA requires that if a lawsuit presents multiple claims, some subject to an arbitration agreement and some not, the former claims must be sent to arbitration—even if this will lead to piecemeal litigation. A trial court may not issue a blanket refusal to compel arbitration of some of a party's claims, merely because the party has other claims which are not subject to the arbitration agreement, or because other parties in the lawsuit are not subject to the arbitration agreement.

After examining both of the circuit court's orders, we find that the circuit court overstepped its authority. The circuit court's blanket refusal to enforce the petitioners' arbitration clauses—merely because it would be inequitable and inefficient to Glenmark, to the petitioners, and to the remaining defendants—ran afoul of the FAA. The FAA permits courts to protect parties from grossly unfair, unconscionable bargains; it does not permit courts to protect commercial litigants from stupid or inefficient bargains willingly and deliberately entered into.

We now consider the arbitration agreement of each petitioner, and examine wheth-

---

**34.** *KPMG LLP v. Cocchi*, 565 U.S. ——, ——, 132 S.Ct. 23, 24, 181 L.Ed.2d 323 (2011) (*per curiam*), citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

**35.** *KPMG LLP v. Cocchi*, 565 U.S. at ——, 132 S.Ct. at 24.

**36.** *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

**37.** *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. at 217, 105 S.Ct. 1238 (*quoting Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638, 646 (7th Cir.1981)).

**38.** *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. at 217, 105 S.Ct. 1238.

er the agreements are otherwise unconscionable or unenforceable.

### C. *The Morgan Keller AIA Agreement*

In its October 19, 2011 order denying petitioner Morgan Keller's motion to compel arbitration, the circuit court found that the arbitration clause was procedurally and substantively unconscionable. Respondent Glenmark argued, and the circuit court agreed, that the clause was procedurally unconscionable because boilerplate language in the AIA A101–1997 and A201–1997 documents established an overly complex procedure for dispute resolution. After reviewing the record, we disagree.

■ Glenmark's complaint indicates that this was a $7.5 million contract. Both Glenmark and Morgan Keller were commercially sophisticated parties familiar with large construction projects. While the AIA contract is a form, it was not drafted by Morgan Keller and offered to Glenmark on a "take-it-or-leave-it" basis. The form was in an electronic format, and the parties were free to amend and alter the form, and did. (For instance, the parties altered a paragraph to state that any arbitration is to occur in Morgantown, West Virginia.) While the dispute resolution process devised in the AIA contract is complex, the terms creating the process were not themselves hidden or unduly complex for commercial entities. And we see nothing in the record to indicate that the contract was formed in a manner or setting that prevented Glenmark from having a reasonable opportunity to understand the terms

of the arbitration clause. We reject the circuit court's determination that Morgan Keller's arbitration clause was procedurally unconscionable.

The circuit court also found that the Morgan Keller arbitration agreement was substantively unconscionable. The circuit court's decision was based, in part, on the finding that the arbitration agreement would result in piecemeal litigation, a finding we rejected earlier in this opinion. The circuit court also found that because the Morgan Keller agreement limited Glenmark's right to recover consequential damages, the agreement precluded the plaintiff from effectively vindicating its rights.

■ After reviewing the AIA arbitration clause in the Morgan Keller contract, we reject the circuit court's finding that it was substantively unconscionable. The arbitration clause is not one-sided; it limits the rights of both Morgan Keller and Glenmark to recover consequential damages.[39] Additionally, there is absolutely no evidence in the record to suggest that the inability of Glenmark to recover consequential damages from Morgan Keller will impair its ability to otherwise pursue relief.[40] And lastly, we see nothing in the record to indicate that the limitation on consequential damages is, in the context of this commercial construction agreement, commercially unreasonable.[41]

Our law requires a showing of both procedural and substantive unconscionability, at

---

**39.** *See, e.g., Brown I,* 228 W.Va. at 683, 724 S.E.2d at 287 ("[M]utuality of obligation is the locus around which substantive unconscionability analysis revolves.").

**40.** *See, e.g., In re: American Express Merchants' Litigation,* 667 F.3d 204 (2nd Cir.2012) (quoting *In re American Express Merchants' Litigation,* 554 F.3d 300, 315 (2nd Cir.2009) and *Green Tree Financial Corp.–Alabama v. Randolph,* 531 U.S. 79, 92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)) ("[W]hen a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." Plaintiffs presented evidence establishing that the out-of-pocket cost of individually arbitrating their dispute would be prohibitive—"just for the expert economic study and services, would be at least several hundred

thousand dollars" to recover average damages of $5,252—effectively depriving plaintiffs of the statutory protections of the antitrust laws.)

**41.** The limitation on consequential damages was added to the AIA documents as a result of *Perini Corp. v. Greate Bay Hotel & Casino, Inc.,* 129 N.J. 479, 610 A.2d 364 (1992). In *Perini,* a construction manager was paid $600,000 to oversee renovation of a hotel casino. When completion of the project was delayed for four months, the casino filed an arbitration proceeding seeking consequential damages in the form of lost profits. A panel of arbitrators awarded the casino $14.5 million. Following *Perini,* the AIA amended its form documents to provide for a waiver of the parties' consequential damages. *See* Werner Sabo, *Legal Guide to AIA Documents,* § 4.85 at 521 (5th Ed.2008).

least in some small measure. Glenmark failed to show either in the Morgan Keller arbitration agreement. Accordingly, the circuit court erred in refusing to enforce the agreement, and the writ of prohibition sought is warranted.

### D. *The York Petitioners' Maintenance Agreement*

To reiterate, Glenmark has asserted two different legal positions for recovery from the two York petitioners. First, Glenmark claims that as its office building was being constructed in 2003 and 2004, the York petitioners designed, manufactured, and/or installed an HVAC system that was defective and not fit for the ordinary purposes of the building. Second, after the building was constructed, Glenmark signed a maintenance agreement in December 2004 under which the York petitioners would perform routine maintenance on the HVAC equipment. Glenmark claims that the York petitioners breached this agreement after December 2004, and carelessly performed maintenance on the system.

The parties agree that only the maintenance agreement contains an arbitration clause. The York petitioners assert that they are entitled to a writ of prohibition to compel *all* of Glenmark's claims (those that pre-date and post-date the maintenance agreement) to be submitted to arbitration. The circuit court rejected this assertion, and determined that only Glenmark's claims arising from the maintenance agreement and which post-date the agreement were covered by the arbitration clause. The circuit court refused to extend the arbitration clause to encompass causes of action arising from the specification, selection, design, manufacture, or installation of the HVAC system, all of which occurred before the maintenance agreement was signed. We agree.

The arbitration clause contained within the maintenance agreement states that, "All claims, disputes and controversies arising out of or relating to this contract, or the breach thereof, shall, in lieu of court action be submitted to arbitration[.]" By its terms, the contract applies only to "professional maintenance services on the air conditioning system" owned by Glenmark. The contract explicitly excludes "repairs, parts, installation or service calls made at the customer's request." As we stated in *Brown I*, "parties are only bound to arbitrate those issues that by clear and unmistakable writing they have agreed to arbitrate. An agreement to arbitrate will not be extended by construction or implication." [42] The circuit court was correct in its choice to not extend the arbitration clause to cover disputes that pre-date the maintenance agreement, because the parties did not by a clear and unmistakable writing agree to arbitrate those matters. The York petitioners are, therefore, not entitled to a writ of prohibition to compel Glenmark to arbitrate *all* of its claims against the York petitioners.

In its October 5, 2011 order, the circuit court went on to find that the York petitioners' arbitration clause was unconscionable and, therefore, unenforceable. The circuit court found that the arbitration clause was procedurally unconscionable for one reason: that it was a form contract of adhesion. We reject this conclusion because, while adhesion contracts are worthy of additional scrutiny,[43] they are "generally enforceable because it would be impractical to void every agreement merely because of its adhesive nature." [44] Glenmark and the circuit court's order fail to identify any particular terms that are oppressive or beyond the reasonable expectations of reasonable businesses like the parties to this case, and we find none in the record. Glenmark and the circuit court's order also do not identify any inequities,

---

**42.** Syllabus Point 10, *Brown I*.

**43.** Syllabus Point 18 of *Brown I* states:

 A contract of adhesion is one drafted and imposed by a party of superior strength that leaves the subscribing party little or no opportunity to alter the substantive terms, and only the opportunity to adhere to the contract or

reject it. A contract of adhesion should receive greater scrutiny than a contract with bargained-for terms to determine if it imposes terms that are oppressive, unconscionable or beyond the reasonable expectations of an ordinary person.

**44.** *Brown I*, 228 W.Va. at 682, 724 S.E.2d at 286 (citation omitted).

improprieties or unfairness in the bargaining process and formation of the contract, and we find none in the record. We therefore cannot say the arbitration clause is, in any way, procedurally unconscionable.

■ The circuit court next determined that the York petitioners' maintenance agreement was substantively unconscionable because it limits Glenmark's "compensatory, special, indirect, consequential or incidental damages." [45] However, the record is devoid of any evidence or inference to establish that this contract term was commercially unreasonable under the particular circumstances of this construction case. Further, there is no evidence indicating whether this limitation will impair Glenmark's ability to pursue relief from the York petitioners. In other words, the record does not support the circuit court's conclusion that the agreement is substantively unconscionable.

Our law requires a showing of both procedural and substantive unconscionability, at least in some small measure. Neither has been shown. Accordingly, we find that Glenmark failed to establish that the York petitioners' arbitration agreement was unconscionable. The circuit court therefore erred in refusing to enforce the agreement to compel Glenmark to arbitrate its claims arising from the post-construction maintenance agreement. The writ of prohibition sought, as moulded, is warranted.

### IV. *Conclusion*

For the foregoing reasons, the writ of prohibition, as moulded, is granted.

Writ granted as moulded.

---

**45.** The York petitioners' maintenance agreement states, in part:
> Limitations of Liability ...
> In no event shall Company liability for direct or compensatory damages exceed the payments received by Company from Customer under this contract, nor shall Company be liable for any special, indirect, consequential or incidental damages of any nature.