IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2025 Term

_____

No. 24-ICA-340

_____

FILED

June 12, 2025

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

AMERIPRISE FINANCIAL, INC.,
Third-Party Defendant Below, Petitioner

v.

CHARLES E. VALLANDINGHAM,
Third-Party Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action No. CC-20-2010-C-221

REVERSED

_____

Submitted: April 8, 2025
Filed: June 12, 2025

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Charleston, West Virginia

Edward P. Tiffey, Esq.
Tiffey Law Practice, PLLC
Charleston, West Virginia

Counsel for Petitioner

Kelly Elswick-Hall, Esq.
Marvin W. Masters, Esq.
The Masters Law Firm L.C.
Charleston, West Virginia
Counsel for Respondent

CHIEF JUDGE LORENSEN delivered the Opinion of the Court.

JUDGE WHITE dissents and reserves the right to file a separate opinion.

LORENSEN, CHIEF JUDGE:

Petitioner Ameriprise Financial, Inc. ("Ameriprise") argues that the Circuit Court of Kanawha County erred in finding that Ameriprise fraudulently induced Respondent Charles E. Vallandingham ("Vallandingham"), a financial advisor working for Ameriprise as a franchisee, into buying the business of another Ameriprise financial advisor. Ameriprise claims that Vallandingham entered into a release agreement waiving any claim of fraudulent inducement against Ameriprise. We agree and reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ameriprise is a national broker of financial products such as stocks, bonds, exchange-traded funds, life insurance policies, and other financial products, and is regulated by the Financial Industry Regulatory Authority ("FINRA"). Ameriprise enters into franchise agreements with financial planners and advisors who operate as independent contractors and sell financial products to Ameriprise customers. Vallandingham is a licensed and certified financial planner authorized to sell various financial products. In December of 1999, Ameriprise and Vallandingham entered into an Independent Advisor Franchise Agreement ("Franchise Agreement"), and Vallandingham began working as an Ameriprise franchisee. In December of 2007, Vallandingham purchased a practice[1] from a

---

[1] The individual businesses of Ameriprise franchisees, consisting of their set of existing Ameriprise clients, are referred to in the record and briefing as a "business," a "book of business," or a "practice." For simplicity and uniformity, we will refer to each Ameriprise franchisee's individual business as a "practice."

1

fellow Ameriprise advisor, Gary Enoch. After the completion of this purchase, Vallandingham had over 200 Ameriprise clients, and by early 2009, he was managing over $20 million in client assets.

In February of 2008, Ameriprise notified another one of its franchisees, Kenneth Beck ("Beck"), that he was in default of the financial planning standard of the Franchise Agreement[2] for calendar year 2007. This standard required each Ameriprise advisor to produce a minimum of five plans or $3,000 in fees each year. Ameriprise informed Beck that he had until December 30, 2008, to cure the default. Beck failed to cure his default, and on January 7, 2009, Ameriprise sent him a notice informing him that it was terminating his Franchise Agreement and that he had ninety days to find a buyer for his practice. Under the terms of the Franchise Agreement, Ameriprise had a right of first refusal to purchase a franchisee's practice.

Ameriprise's policies and procedures for a franchisee's purchase of another franchisee's practice were set forth in its Succession Planning and Internal Practice Acquisition Manual ("Acquisition Manual"). The Acquisition Manual specifically provided that "each advisor should request a copy of their Compliance report to provide to the other." The Acquisition Manual further explained that "[a]n advisor [cannot] request a

---

[2] The circuit court did not find that there were any material differences between the Franchise Agreements Vallandingham and Beck executed with Ameriprise, and neither party argues any such difference on appeal.

2

report on behalf of another advisor," and that "[t]he Company [cannot], legally, provide a purchaser with confidential information regarding a selling advisor['s] compliance history and vice versa." The Acquisition Manual also provided that the sale of a practice from one franchisee to another could not be considered valid until Ameriprise approved it. The Franchise Agreement included a similar provision that "[a]ny purported assignment or transfer not having the written consent of [Ameriprise] . . . shall be null and void." The Franchise Agreement also provided that Ameriprise would not unreasonably withhold its consent to a transfer of practice. However, the Franchise Agreement qualified that Ameriprise could condition this consent on a release of all claims against Ameriprise.

Shortly after Beck received his termination notice, Vallandingham began negotiating for the purchase of Beck's practice. After initially discussing the possibility of the purchase with Beck and agreeing to meet later to discuss it in detail, Vallandingham called Ameriprise Franchise Field Vice President William C. Cupach ("Cupach"). Vallandingham asked Cupach whether Beck's Franchise Agreement was actually being terminated due to his failure to generate sufficient business, and Cupach confirmed that this was the reason. Vallandingham then asked "[i]s there anything else I need to know regarding this transaction?" Cupach responded "no."

Vallandingham reviewed Beck's profile on BrokerCheck, a free online service operated by FINRA that provides background information on investment professionals. Vallandingham did not find any notations, disclosable events, complaints, or

3

forgeries on Beck's FINRA record. Vallandingham also looked at Beck's compliance charges on his Ameriprise compensation statement. Vallandingham saw that Beck's compliance charges were the same as his own, and interpreted that to mean that Ameriprise had no compliance issues with Beck. However, Vallandingham did not ask Beck for a copy of or access to his internal Ameriprise compliance report. At that time, Beck's compliance report included multiple references to past compliance issues.

In March of 2009, Vallandingham and Beck executed a Buy/Sell Agreement under which Vallandingham agreed to purchase Beck's practice for $75,000.[3] Shortly thereafter, Vallandingham, Beck, and Ameriprise executed a "Consent to Transition Agreement and Release of Claims" ("Consent and Release") under which Ameriprise provided its consent—as required under the Franchise Agreement—for the Buy/Sell Agreement, and waived its right of first refusal to purchase Beck's practice. The Consent and Release, which referred to the Buy/Sell Agreement as a "Transition Agreement" or "Succession Agreement," included a provision (the "Due Diligence Clause") under which the parties agreed they had independently investigated the transaction and disclaimed reliance on any representations by Ameriprise:

> Transferring Advisor and Acquiring Advisor each acknowledges that he/she has independently entered into the Transition Agreement, that each has conducted any due

---

[3] As the parties note in their briefs before this Court, Vallandingham completed the purchase of Beck's practice with financial assistance from another Ameriprise advisor, Mark Arnold, who also signed the various documents surrounding the transaction. As Mr. Arnold is neither a party to this appeal nor relevant to its resolution, this Court will not discuss him further.

diligence or investigation he/she deems appropriate, has made an independent assessment of the Transition Agreement, and has not relied upon any representation or action by Ameriprise in deciding to enter into the Succession Agreement. Transferring Advisor and Acquiring Advisor each acknowledge that Ameriprise is not a party to the Transition Agreement, and that Ameriprise's consent to the Transition Agreement pursuant to the Franchise Agreement does not constitute an adoption or approval of the terms of the Transition Agreement.

In addition, Vallandingham waived any claims against Ameriprise related to the Buy/Sell Agreement (the "Release Clause"):

In consideration of Ameriprise's consent to the Transition Agreement, Acquiring Advisor hereby releases all rights or claims, known or unknown, he/she has or may have now to any relief of any kind from Ameriprise and any company related to or affiliated with Ameriprise in the present or past, Ameriprise's present or past officers, directors, employees, and any person who acted on behalf of Ameriprise or on instructions from Ameriprise, relating to or arising from the negotiation of, execution of, implementation of, or performance by the Transferring Advisor of any obligation under the Transition Agreement. Notwithstanding the previous sentence, nothing in this paragraph shall constitute a release of any claim that Acquiring Advisor has or may have against Transferring Advisor relating to or arising out of the Transition Agreement.

After completing the agreement and taking on Beck's clients, Vallandingham began noting what he perceived as issues with Beck's prior interactions and transactions with those clients. Among other things, Vallandingham found that Beck had borrowed $500 from one client, which was a FINRA violation. Vallandingham also determined that Beck had sold some clients financial products that Vallandingham perceived as disadvantageous

for their situations, including life insurance policies that he believed were likely to be insolvent. Vallandingham encouraged several of these clients to file complaints with Ameriprise. Vallandingham perceived that addressing these issues with Beck's former clients took up a disproportionate amount of his time, and that resolving these issues damaged his practice and reputation.

On February 4, 2010, Beck filed the underlying complaint in the Circuit Court of Kanawha County, alleging that Vallandingham breached the Buy/Sell Agreement by failing to pay Beck $75,000 for his practice. On July 22, 2010, Vallandingham filed a third-party complaint against Ameriprise, alleging claims of negligence, violations of regulations, breach of contract, and unjust enrichment.

On November 8, 2010, Ameriprise filed a motion for summary judgment on Vallandingham's claims, arguing that Vallandingham's claims were barred under the Consent and Release. On February 18, 2011, the circuit court entered an order denying Ameriprise's motion for summary judgment. The circuit court found that the Release Clause of the Consent and Release applied to Vallandingham's claims, but denied the motion "to permit discovery of whether Ameriprise committed fraud or collusion upon Vallandingham, or was somehow negligent toward Vallandingham." On May 2, 2011, Vallandingham filed a motion to amend his third-party complaint to add claims for joint venture and fraud. On February 24, 2012, the circuit court entered a partial dismissal order dismissing all of Beck's claims, with prejudice, for failure to prosecute, and the case

6

continued on Vallandingham's third-party complaint against Ameriprise. The circuit court granted Vallandingham's motion for leave to file an amended third-party complaint, and on July 3, 2013, he filed his amended third-party complaint, raising claims for a violation of regulations, negligence, breach of contract, and unjust enrichment.

On September 26, 2013, Ameriprise filed a second motion for summary judgment. Among other arguments, Ameriprise asserted that Vallandingham's claims were barred by the Due Diligence and Release Clauses of the Consent and Release. On October 10, 2013, Ameriprise filed a pre-trial memorandum, reiterating the legal argument that Vallandingham's claims were barred by the Consent and Release. Vallandingham filed a pre-trial memorandum on October 15, 2013, adding a claim that Ameriprise fraudulently induced Vallandingham to enter the Buy/Sell Agreement, or fraudulently concealed material information. The circuit court held a pre-trial conference on October 15, 2013, in which it heard argument on Ameriprise's pending motion for summary judgment. The circuit court recognized that it had just received Vallandingham's pre-trial memorandum, which contained "additional theories of liability." The circuit court ultimately ruled that summary judgment was not warranted because there were issues of fact regarding whether Vallandingham was fraudulently induced to enter the Buy/Sell Agreement.

The nine-day bench trial in this matter began on October 21, 2013. At trial, Vallandingham primarily pursued a theory that Ameriprise fraudulently induced him to purchase Beck's practice by misrepresenting or concealing Beck's compliance issues. At

7

trial, counsel for Ameriprise again argued that the Consent and Release was a bar to Vallandingham's claims, beginning in its opening statement. At the close of Vallandingham's evidence, on the sixth day of trial, Ameriprise made a motion for judgment as a matter of law on Vallandingham's fraud claim. Among other arguments, Ameriprise again asserted that Vallandingham's claim was barred by the Consent and Release. The circuit court denied this motion on the record. Ameriprise renewed its motion for judgment as a matter of law on the ninth and final day of the bench trial, and the circuit court denied the motion again. The circuit court directed counsel for each party to submit proposed findings of fact and conclusions of law.

The parties submitted their proposed orders with findings of fact and conclusions of law on January 28, 2014. Ameriprise's proposed order included a finding that Vallandingham released his fraud claim against Ameriprise under the Consent and Release, specifically the Due Diligence and Release Clauses.

Over ten years later, on July 30, 2024, the circuit court entered its final order.[4] The circuit court did not explicitly address the Consent and Release in the final order. However, the circuit court rejected the argument that contractual disclaimers barred Vallandingham's fraud claim. Specifically, the circuit court quoted the Supreme Court of Appeals of West Virginia's ("SCAWV") explanation that "[i]n the same way that fraud is

_____

[4] It is not clear to this Court from the record or the briefing why there was a ten-year delay in the circuit court's entry of a final order.

8

recognized as an exception to the [parol] evidence rule, fraud is similarly recognized to be an exception to the contractual language typically found in an integration or merger clause which seeks to limit one party's liability to the other." *Traders Bank v. Dils*, 226 W. Va. 691, 696, 704 S.E.2d 691, 696 (2010).

The circuit court concluded that Vallandingham proved his claim that Ameriprise fraudulently induced him to enter the Buy/Sell Agreement to buy Beck's practice. Further, the circuit court found that Vallandingham could not have independently verified Beck's compliance history and discovered the issues in his practice without reviewing his internal compliance file. The circuit court determined that Ameriprise had no duty to disclose Beck's internal compliance file to Vallandingham. However, the circuit court concluded that when Vallandingham asked Cupach "[i]s there anything else I need to know regarding this transaction?" and Cupach responded "no," Cupach—and therefore Ameriprise—made a material misrepresentation to Vallandingham. The circuit court found that Vallandingham justifiably relied on this misrepresentation in buying Beck's practice, and that he was subsequently damaged. The circuit court entered judgment in favor of Vallandingham and against Ameriprise in the total amount of $1,320,794.

It is from the July 30, 2024, final order that Ameriprise now appeals.

9

## II.    STANDARD OF REVIEW

The SCAWV has set forth a multi-pronged standard of review for circuit court orders entered after a bench trial:

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Pub. Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996). "Further, 'we apply a *de novo* standard of review to [a] circuit court's interpretation of [a] contract.'" *Wheeling Jesuit Univ., Inc. v. Voorhees*, 250 W. Va. 674, 677, 907 S.E.2d 572, 575 (Ct. App. 2024) (quoting *Home Inspections of VA and WV, LLC v. Hardin*, 244 W. Va. 173, 176, 852 S.E.2d 240, 243 (2020)).

## III.    DISCUSSION

Ameriprise raises three assignments of error on appeal. However, because we find the first assignment of error to be dispositive, we will not address the other two. In its first assignment of error, Ameriprise contends that the circuit court erred in not entering judgment as a matter of law on Vallandingham's fraud claim.[5] Among other reasons it

---

[5] In arguing its first assignment of error, Ameriprise asserts that it was entitled to summary judgment, that it was entitled to judgment as a matter of law, and that the circuit court's judgment in favor of Vallandingham should be set aside. As Ameriprise only appealed the circuit court's July 30, 2024, final order, and specifically refers to findings in

10

believes it was entitled to judgment, Ameriprise argues that Vallandingham waived his fraud claim under the Due Diligence and Release Clauses of the Consent and Release. We agree.

As discussed above, the circuit court did not explicitly address the Consent and Release in its final order. Rather, the circuit court found, generally, that merger clauses in contracts could not waive fraud claims. Specifically, the circuit court quoted the SCAWV's explanation that "[i]n the same way that fraud is recognized as an exception to the [parol] evidence rule, fraud is similarly recognized to be an exception to the contractual language typically found in an integration or merger clause which seeks to limit one party's liability to the other." *Traders Bank v. Dils*, 226 W. Va. 691, 696, 704 S.E.2d 691, 696 (2010) (citations omitted). On appeal, Vallandingham relies on *Traders Bank* in arguing that the Consent and Release did not bar his fraud claim.

In relying on this language from *Traders Bank*, both the circuit court and Vallandingham misinterpret the nature of the relevant provisions of the Consent and Release for two reasons. First, the Due Diligence Clause of that agreement is not a merger

the final order in arguing this assignment of error, we construe this assignment of error as being raised as a challenge to the final order, despite Ameriprise's references to summary judgment. However, since we decide this matter on the legal issue of contract interpretation, we apply the same de novo standard of review applicable on review of a summary judgment order. Moreover, while Ameriprise characterizes the claim Vallandingham prevailed on below as a fraudulent concealment claim, because the circuit court found fraud based on an affirmative misrepresentation, we characterize it as a fraud or fraudulent inducement claim.

11

or integration clause. Second, the Consent and Release is a separate contract from the Buy/Sell Agreement.

As the SCAWV has explained, "[a] merger clause is [a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document." *TD Auto Fin. LLC v. Reynolds*, 243 W. Va. 230, 234, 842 S.E.2d 783, 787 (2020) (quoting *Frederick Bus. Properties Co. v. Peoples Drug Stores, Inc.*, 191 W. Va. 235, 240 n.2, 445 S.E.2d 176, 181 n.2 (1994)). By its plain terms, the Due Diligence Clause in the Consent and Release is not a merger or integration clause. Rather, it is an explicit provision by which the parties specifically disclaimed reliance on any representation by Ameriprise in deciding to enter into a separate Buy/Sell Agreement. In *In re Marine Energy Sys. Corp.*, 299 F. App'x 222 (4th Cir. 2008)—one of the cases the SCAWV specifically relied on in *Traders Bank*—the Fourth Circuit recognized that this type of provision, characterized as a "non-reliance" clause, is distinct from a merger clause. *See In re Marine Energy Sys. Corp.*, 299 F. App'x 222, 228-30 (4th Cir. 2008) (discussing merger and non-reliance clauses).[6] Critically, unlike merger clauses, non-reliance clauses specifically disclaim the parties' reliance on outside representations in the decision to enter the contract and therefore bar

---

[6] The Fourth Circuit's recognition of this distinction is not unique; courts across the country have recognized the difference between merger or integration clauses and non-reliance clauses. *See, e.g.*, *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644-45 (7th Cir. 2002). These clauses are also sometimes referred to as "no-reliance clauses" or "anti-reliance clauses."

12

misrepresentation claims, including fraud. *See In re Marine*, 299 F. App'x 222, 230-32 (affirming summary judgment on fraud claim based on non-reliance clause). As one federal court has explained, "the purpose of such a clause is to head off a suit for fraud." *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008).

Therefore, contrary to the circuit court's implicit conclusion that the Due Diligence Clause in the Consent and Release is a merger clause that does not exclude a fraud claim, we now find that said clause is a non-reliance clause plainly intended to bar fraudulent inducement claims like Vallandingham's. However, we need not decide whether a non-reliance clause in a contract would be enforceable as a waiver of a fraudulent inducement claim by one party to that contract against another. Here the circuit court found that Ameriprise fraudulently induced Vallandingham to enter the Buy/Sell Agreement to purchase Beck's practice. However, Ameriprise was not a party to the Buy/Sell Agreement, and the non-reliance clause at issue was in a separate agreement, the Consent and Release. Therefore, the issue before this Court is not whether a clause in a contract can waive a party's claim that it was fraudulently induced to enter that contract; rather, the issue is whether a party can release a fraudulent inducement claim against a non-party to the contract through a separate agreement.[7]

---

[7] We recognize that a party can invalidate a contract releasing claims by demonstrating that it was induced by fraud. *See Thomson v. McGinnis*, 195 W. Va. 465, 472-73, 465 S.E.2d 922, 929-30 (1995). However, in the instant case, the circuit court found that Ameriprise fraudulently induced Vallandingham to enter the Buy/Sell

13

## A. Consent and Release Language

Having framed the issue, we now consider Ameriprise's argument that Vallandingham waived and released his fraud claim in the Consent and Release. "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. Pt. 3, *Miller v. WesBanco Bank, Inc.*, 245 W. Va. 363, 859 S.E.2d 306 (2021) (quoting Syl. Pt. 1, *Sally-Mike Properties v. Yokum*, 175 W. Va. 296, 332 S.E.2d 597 (1985)). "If language in a contract is found to be plain and unambiguous, such language should be applied according to such meaning." *Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996).

As a general matter, the SCAWV enforces contracts releasing claims. *Donahue v. Mammoth Restoration & Cleaning*, 246 W. Va. 398, 405, 874 S.E.2d 1, 8 (2022) (affirming circuit court's conclusion that release in settlement agreement barred breach of contract and bad faith claims against insurer); *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 513-14, 694 S.E.2d 815, 846-47 (2010) (affirming circuit court's enforcement of releases to bar claims of reckless and wanton conduct). While these contracts typically arise in the context of settlement agreements, the SCAWV has also

---

Agreement, not the Consent and Release. Nor does Vallandingham argue on appeal that the separate Consent and Release was obtained by fraud.

explained that "settlement agreements are contracts and therefore, 'are to be construed as any other contract.'" *Donahue*, 246 W. Va. at 404, 874 S.E.2d at 7 (quoting *Burdette v. Burdette Realty Improvement, Inc.*, 214 W. Va. 448, 452, 590 S.E.2d 641, 645 (2003) (per curiam)). Moreover, the SCAWV has enforced contracts releasing claims outside the settlement context. *See McKeny Const. Co. v. Town of Rowlesburg*, 187 W. Va. 521, 525, 420 S.E.2d 281, 285 (1992) (per curiam). Indeed, the SCAWV has held that pre-injury exculpatory releases waiving claims for intentional misconduct can be enforceable if the circumstances clearly indicate the plaintiff's intent to waive such claims. *See* Syl. Pt. 2, *Murphy v. N. Am. River Runners, Inc.*, 186 W. Va. 310, 412 S.E.2d 504 (1991).

We find that the Consent and Release is unambiguous and that Vallandingham plainly waived any claim that Ameriprise fraudulently induced him to enter the Buy/Sell agreement. The Release Clause provides that:

> [Vallandingham] releases all rights or claims, known or unknown, [he] has or may have now to any relief of any kind from Ameriprise and any company related to or affiliated with Ameriprise in the present or past, Ameriprise's present or past officers, directors, employees, and any person who acted on behalf of Ameriprise or on instructions from Ameriprise, relating to or arising from the negotiation of, execution of, implementation of, or performance by the Transferring Advisor of any obligation under the Transition Agreement.

We find that this language plainly contemplates a fraud claim like the one at issue in this case. After initial discussions with Beck about buying his practice, Vallandingham called Cupach to ask questions about Beck's practice. Subsequently, he filed a fraud claim against Ameriprise based on Cupach's answer to one of those questions. This claim was clearly

15

"relating to or arising from" the negotiation, execution, and implementation of the Buy/Sell Agreement. While the Release Clause alone is clear, the Due Diligence Clause reinforces that Vallandingham waived any claim that Ameriprise fraudulently induced him to enter the Buy/Sell Agreement:

> [Vallandingham] acknowledges that [he] has independently entered into the [Buy/Sell], that [he] has conducted any due diligence or investigation [he] deems appropriate, has made an independent assessment of the [Buy/Sell] Agreement, and has not relied upon any representation or action by Ameriprise in deciding to enter into the [Buy/Sell] Agreement.

As discussed above, the Due Diligence Clause is a non-reliance clause specifically intended to foreclose fraudulent inducement claims. We find that these clauses demonstrate that Vallandingham waived and released any claim that Ameriprise fraudulently induced him to enter the Buy/Sell Agreement.

Beyond his reliance on *Traders Bank*, which we have already addressed, Vallandingham offers four reasons evidencing that he did not waive his fraud claim by signing the Consent and Release. First, Vallandingham argues that Ameriprise cannot maintain that it is not a party to a contract and simultaneously claim its protection. This argument conflates the Buy/Sell Agreement with the Consent and Release. Ameriprise was not a party to the Buy/Sell Agreement, but it was a party to the Consent and Release, which is the contract it relies on. Next, Vallandingham argues that the Due Diligence Clause in the Consent and Release only applies to affirmative misrepresentations, rather than concealment. However, as discussed, the circuit court found that Ameriprise committed

16

fraud based on an affirmative misrepresentation—Cupach's answer "no" to Vallandingham's inquiry if there was anything else he needed to know—so we find that this argument is also unavailing.

Third, Vallandingham argues that the Consent and Release only purports to release Ameriprise for the actions of Beck. Vallandingham points to the language in the Release Clause releasing claims against Ameriprise "relating to or arising from the negotiation of, execution of, implementation of, or performance by the Transferring Advisor of any obligation under the [Buy/Sell] Agreement," specifically emphasizing the "by the Transferring Advisor" language. While Vallandingham does not explain this argument precisely, he appears to be arguing that the "by the Transferring Advisor" language in the final item in the series in this clause should be read to apply to each item. As best we can understand this argument, Vallandingham suggests that this clause should be read to say that he released claims against Ameriprise "relating to or arising from the negotiation [by the Transferring Advisor] of, execution [by the Transferring Advisor] of, implementation [by the Transferring Advisor] of, or performance by the Transferring Advisor of any obligation under the [Buy/Sell] Agreement." We find this reading to be contrary to the plain reading of this clause and decline to employ it.[8]

---

[8] Though he does not cite it, Vallandingham appears to be relying on a canon of interpretation known as the "series-qualifier canon," which some courts have employed in interpreting statutes. "The series-qualifier canon . . . provides that, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series.'" *ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*, 113 F.4th 1312, 1322 (11th Cir. 2024) (quoting Antonin

Finally, Vallandingham asserts that "Ameriprise did not negotiate the [Buy/Sell Agreement], so [Vallandingham] is not seeking to hold Ameriprise responsible for negotiation of the agreement." This too is unavailing. As discussed above, the Release Clause contemplates a release of all claims "relating to or arising from" the negotiation of the Buy/Sell agreement. It is undisputed—indeed, it is the linchpin of Vallandingham's fraud claim—that Vallandingham was specifically seeking information about Beck's practice in service of Vallandingham's plan to buy Beck's practice when Cupach answered the fraudulent "no" to Vallandingham's question about Beck's practice. Plainly, a fraud claim based on this conversation was related to and arose from Vallandingham's negotiation of the Buy/Sell Agreement.

---

Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 147). Put differently, "[w]hen several words are followed by a clause [that] [ ] is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Id.* (quoting *Paroline v. United States*, 572 U.S. 434, 447 (2014)). The SCAWV declined to apply this canon to a plea agreement that the Court found to be unambiguous. *See State v. Whindleton*, No. 19-0333, 2020 WL 2735448, at *6 (W. Va. May 26, 2020) (memorandum decision). Moreover, in implicitly advocating this canon, Vallandingham disregards the parallel structure of the items in the series, each of which includes the word "of." It would require a forced and unnatural reading of the structure of this series to read the final item "or performance by the Transferring Advisor of any obligation under" and read the words "by the Transferring Advisor," which occur before the word "of," in that item, to modify each prior item in the series, as Vallandingham suggests.

Therefore, under the plain terms of the Consent and Release, Vallandingham waived and released his claim that Ameriprise fraudulently induced him to enter the Buy/Sell Agreement to buy Beck's practice.[9]

_____

[9] It has long been a fundamental principle of the law that "[c]ourts are not constituted for the purpose of making advisory decrees or resolving academic disputes." Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991) (quoting *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of Fairmont,* 126 W.Va. 183, 185-86, 27 S.E.2d 486, 487-88 (1943)). The dissent dispenses with this principle and creates a new one, answering a question that is not before the Court or necessary to the resolution of this case. This new principle of law—deciding based on a hypothetical contract that a non-reliance clause within that contract is unenforceable against a claim by one party to the contract that the other contracting party fraudulently induced the contract— is not before the Court or resolved by our opinion. Instead, it was created to reach the dissent's preferred result.

The dissent does not address the basis for our decision, which is that a court will enforce unambiguous contracts, including a contract in which one party agrees to release potential legal claims in exchange for consideration. We applied the plain terms of the Consent and Release, under which Vallandingham agreed to release his claims—known or unknown—against Ameriprise related to the Buy/Sell Agreement with Beck, in exchange for Ameriprise waiving its right of first refusal to buy Beck's practice and consenting to Vallandingham's purchase of same. Although the dissent baselessly claims that we predicated this decision on direct enforcement of the Due Diligence Clause, the primary relevance of that clause to our decision is that it plainly demonstrated that the parties intended the Consent and Release to encompass misrepresentation claims, including fraudulent inducement claims.

Instead, the dissent conjures an imaginary contract between Ameriprise and Vallandingham in which Ameriprise directly sold Beck's practice to Vallandingham, and the sale contract included a non-reliance provision mirroring the Due Diligence Clause. The dissent then considers whether that non-reliance provision would bar Vallandingham's claim that Ameriprise fraudulently induced him to enter that contract. To render its advisory answer to this hypothetical, the dissent engages in a review of how courts in other states have answered similar questions, noting that some courts have declined to enforce non-reliance clauses against fraudulent inducement claims, while others have enforced them, provided the clauses are sufficiently specific and not unconscionable. The dissent then predicts that the non-reliance clause in its hypothetical sale contract between

19

## B. Unconscionability

While we determine that Vallandingham waived his fraud claim under the plain terms of the Consent and Release, we find it prudent to consider whether the Consent and Release is unenforceable under the doctrine of unconscionability. We conclude that it is not unconscionable.

---

Ameriprise and Vallandingham would be unenforceable. It is not entirely clear if the dissent believes West Virginia would join those states that do not enforce non-reliance clauses at all, or if such clauses are enforceable but this one would not be. Regardless, the dissent concludes that if a non-reliance clause mirroring the Due Diligence clause had been included in a sale contract between Ameriprise and Vallandingham, it would have been unenforceable against a fraudulent inducement claim. Perhaps the dissent is correct; because it interprets a contract not before the Court and answers an academic question, to say whether it is right or wrong would be to issue an advisory opinion, which this Court is without authority to do. *See Cummings v. Paine*, 249 W. Va. 568, 574, 899 S.E.2d 646, 652 (Ct. App. 2024) ("This Court, like the SCAWV, is not authorized to resolve such hypothetical case scenarios.").

The dissent's misrepresentations of our decision are legion, so we will not attempt to address them all. However, a few of the most egregious warrant refutation. The dissent claims that we decided to "giv[e] conclusive legal effect to 'non-reliance' contract clauses," that we "declare[d] that a party to a contract may incorporate standardized exculpatory language that compels another party to release every conceivable claim of fraud before it has arisen, merely by declaring in writing that the other party did not rely on anything the drafter of the contract said or did." Not only is our decision entirely free from these advisory holdings, we explicitly stated that we are not deciding the very issue the dissent accuses us of resolving. We carefully explained that "we need not decide whether a non-reliance clause in a contract would be enforceable as a waiver of a fraudulent inducement claim by one party to that contract against another" and that "the issue before this Court is not whether a clause in a contract can waive a party's claim that it was fraudulently induced to enter that contract." Apparently, the dissent did not find these disclaimers to be sufficiently specific.

The SCAWV has held that "[t]he doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written." Syl. Pt. 12, in part, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011) ("*Brown I*").[10] "Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court." Syl. Pt. 1, *Troy Min. Corp. v. Itmann Coal Co.*, 176 W. Va. 599, 346 S.E.2d 749 (1986). A court that finds a contract or clause unconscionable "may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause, or limit the application of any unconscionable clause to avoid any unconscionable result." *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 16, in part. The SCAWV has emphasized that unconscionability must be decided "on a case-by-case basis," Syl. Pt. 9, in part, *Dan Ryan Builders, Inc. v. Nelson*, 230 W. Va. 281, 737 S.E.2d 550 (2012), "taking into consideration all of the facts and circumstances of a particular case." *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 12.

---

[10] On certiorari review, the Supreme Court of the United States vacated *Brown I* and remanded to the SCAWV for additional proceedings. *See Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012) (per curiam). The SCAWV subsequently entered another opinion, *Brown v. Genesis Healthcare Corp.*, 229 W. Va. 382, 395, 729 S.E.2d 217, 230 (2012) ("*Brown II*"), in which the Court reaffirmed all but one of the holdings of *Brown I*. The one holding in *Brown I* found to be erroneous in *Marmet* and overruled in *Brown II* is not relevant to this appeal.

Unconscionability has two components: procedural unconscionability and substantive unconscionability. *See Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 20. "To be unenforceable, a contract term must—'at least in some small measure'—be both procedurally and substantively unconscionable." *Dan Ryan Builders*, 230 W. Va. at 289, 737 S.E.2d at 558 (quoting *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W. Va. 486, 498-99, 729 S.E.2d 808, 820-21 (2012)). We find that the Consent and Release is neither procedurally nor substantively unconscionable.

"Procedural unconscionability arises from inequities, improprieties, or unfairness in the bargaining process and the formation of the contract, inadequacies that suggest a lack of a real and voluntary meeting of the minds of the parties." *Dan Ryan Builders*, 230 W. Va. at 289, 737 S.E.2d at 558 (citing *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 17). Factors that influence procedural unconscionability include "the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract." *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 17.

Considering these factors, we conclude that the Consent and Release was not procedurally unconscionable. The Consent and Release is a contract of adhesion, in that it was a form contract drafted by Ameriprise for franchisees engaging in the purchase of a practice, such as Vallandingham, to either take or leave. However, the SCAWV has

recognized that the determination that an agreement is a contract of adhesion is merely the beginning of the analysis, and that such contracts are "generally enforceable." *Brown I*, 228 W. Va. at 682, 724 S.E.2d at 286.[11] Moreover, Vallandingham is a sophisticated party: at the time he executed the Consent and Release he was a certified financial planner who had been an Ameriprise franchisee for almost ten years, he was managing hundreds of clients with over $20 million in assets, and he had already purchased a practice from another franchisee. The Consent and Release was also not lengthy or complex; it was only two pages and contained only nine provisions, and neither the Release Clause nor the Due Diligence Clause was complicated or hidden. Indeed, the Release Clause specifically provides that the release of claims is provided "[i]n consideration of Ameriprise's consent to the Transition Agreement." In other words, the Release Clause is explicitly denoted as the linchpin of the Consent and Release Agreement. Finally, we note that Vallandingham initiated the negotiation to purchase Beck's practice that led to the Consent and Release, and that he had the opportunity to understand the terms of the Consent and Release, having already executed the same agreement in 2007 when he bought another practice. Considering these factors, we find that the Consent and Release was not procedurally unconscionable.

---

[11] The SCAWV has also noted that "it is likely that the bulk of the contracts signed in this country are contracts of adhesion," *State ex rel. Saylor v. Wilkes*, 216 W. Va. 766, 774, 613 S.E.2d 914, 922 (2005), and has repeatedly rejected the conclusion that contracts of adhesion are automatically procedurally unconscionable. *See Price v. Morgan Fin. Grp.*, No. 12-1026, 2013 WL 3184671, at *3 (W. Va. June 24, 2013) (memorandum decision); *Pingley v. Perfection Plus Turbo-Dry, LLC*, 231 W. Va. 553, 560, 746 S.E.2d 544, 551 (2013) (per curiam); *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W. Va. 486, 499, 729 S.E.2d 808, 821 (2012).

Though the absence of procedural unconscionability is sufficient to find that the Consent and Release was not unconscionable, *see Dan Ryan Builders*, 230 W. Va. at 289, 737 S.E.2d at 558, we will also analyze substantive unconscionability. The SCAWV has explained that "[s]ubstantive unconscionability involves unfairness in the terms of the contract itself, and arises when a contract term is so one-sided that it has an overly harsh effect on the disadvantaged party." *Id.* (citing *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 19). While "[t]he factors to be weighed in assessing substantive unconscionability vary with the content of the agreement[,] [g]enerally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, syl. pt. 19.

The terms of the Consent and Release applicable to Ameriprise and Vallandingham were not one-sided in favor of Ameriprise. Put simply, Ameriprise waived its right of first refusal to purchase Beck's practice and consented to Vallandingham's purchase of the practice in exchange for Vallandingham releasing any claims against Ameriprise relating to that transaction, including any claim that he relied on any representation from Ameriprise. There is nothing overly harsh or uneven about these terms: in giving up its own right to purchase Beck's practice, Ameriprise simply required that Vallandingham perform his own due diligence and not seek to hold Ameriprise liable related to the transaction. Looking at this agreement, in light of the facts of this case, as the SCAWV instructs, we find that this exchange was eminently reasonable. Ameriprise

24

specifically informed its franchisees that it would not release a franchisee's internal compliance report without the franchisee's consent. Yet in this matter, Ameriprise was held liable for fraud because one of its executives, when asked by Vallandingham if there was anything else he needed to know about Beck's practice, did not disclose Beck's internal compliance history to Vallandingham, despite Vallandingham's failure to seek Beck's consent for that disclosure. Given these conflicting obligations, we conclude that it was reasonable for Ameriprise to exchange its right to purchase a practice for a release of any claims, including misrepresentation claims, related to the transfer of that practice between franchisees.

Finally, we find that the public policy concerns do not support a finding of substantive unconscionability.[12] The SCAWV has held that "[t]his State's public policy favors freedom of contract which is the precept that a contract shall be enforced except when it violates a principle of even greater importance to the general public." Syl. Pt. 3, *Wellington Power Corp. v. CNA Sur. Corp.*, 217 W. Va. 33, 614 S.E.2d 680 (2005).[13] As

---

[12] While we find that the Consent and Release does not violate public policy, we caution that nothing in this decision should be read to suggest that a broker or financial planner could enforce a release of fraud claims against a purchaser of securities. Sales of securities are, of course, subject to federal statutory and regulatory standards that would inform any analysis of unconscionability and public policy. However, as discussed throughout, Ameriprise was not a party to the Buy/Sell Agreement and did not sell anything to Vallandingham in the Consent and Release. Moreover, as Vallandingham recognizes in his brief, in buying Beck's practice, he was buying the management of clients, not the underlying assets, which continued to be held by the clients.

[13] We note that, while the SCAWV has directed courts to consider public policy concerns as a factor impacting substantive unconscionability, a court can also declare

this Court has recognized "sophisticated parties dealing at arm's length in complicated financial transactions should be free to structure their relationships to suit their needs." *PITA, LLC v. Segal*, 249 W. Va. 26, 43 n.39, 894 S.E.2d 379, 396 n.39 (Ct. App. 2023). Moreover, under West Virginia law, although a buyer can generally rely on representations from a seller, "if he undertakes to inform himself from other sources as to matters easily ascertainable, by personal investigation, and the defendant has done nothing to prevent full inquiry, he will be deemed to have relied upon his own investigation and not upon the representations of the seller." Syl. Pt. 5, in part, *Cordial v. Ernst & Young*, 199 W. Va. 119, 483 S.E.2d 248 (1996). Therefore, beyond the fact that Ameriprise was not even the seller in this context, in signing the Consent and Release, Vallandingham merely contracted to do what West Virginia law already allows: eliminate reliance on outside representations by performing his own investigation of the Buy/Sell Agreement. Accordingly, we find that public policy concerns do not support a finding of substantive unconscionability.

Based on the foregoing discussion, we find that the Consent and Release is not substantively unconscionable. Since the Consent and Release is neither procedurally nor substantively unconscionable, we conclude that it is not unconscionable. Having

---

contracts void as against public policy outside of the unconscionability analysis. However, "[t]he judicial power to declare a contract void as contravening sound public policy is a very delicate and undefined power, and should be exercised only in cases free from doubt." *Wellington Power Corp.*, 217 W. Va. 33, 614 S.E.2d 680, at syl. pt. 4 (quoting Syl. Pt. 1, *Barnes v. Koontz,* 112 W. Va. 48, 163 S.E. 719 (1932)) (quotations omitted). As we find in our unconscionability analysis that public policy concerns favor enforcement of the Consent and Release, we find no need to separately address whether it should be declared void as against public policy.

previously concluded that, under the plain and unambiguous terms of the Consent and Release, Vallandingham waived the fraud claim at issue in this matter, and given that the Consent and Release is enforceable, we now conclude that the circuit court erred as a matter of law in finding that the Consent and Release did not bar Vallandingham's fraud claim. Accordingly, we reverse the circuit court's final order entering judgment in favor of Vallandingham.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the July 30, 2024, final order entering judgment in favor of Vallandingham.

Reversed.